Candace SUTHERLAND,
Plaintiff–Appellant,

v.

Christopher SUTHERLAND,
Defendant–Appellee.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

June 5, 1991.

Rehearing Denied July 24, 1991.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 25, 1991.

Joe P. Binkley, Jr., Nashville, for plaintiff-appellant.

Howard F. Butler, Clara Willis Byrd, Lackey, Rodgers, Price & Snedeker, Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

The sole issue in this case is whether the trial court erred in awarding the father, Christopher Sutherland, "the absolute care, custody and control of the minor child" of the parties.

The parties were married on 17 August 1975. One child, Corby Joe · Sutherland, was born to the marriage on 6 March 1985.

The mother, Candace Sutherland,[1] filed her complaint for divorce on 6 June 1988 and sought, *inter alia*, custody of Corby Joe. The father answered and filed a counter-complaint on 14 July 1988 in which he also sought custody of the child.

Prior to any hearing in this case, for some reason which is not apparent to this Court, the father, on 23 November 1988, filed a "Petition for Custody" seeking to have custody of Corby Joe awarded to him. The only ground set forth in the petition was that the mother was having an affair with "another man."

Subsequently, the court issued an order for the mother to appear and show cause why custody should not be awarded to the father. On 17 and 18 January 1989, the court held a show cause hearing and, on 3 February 1989, entered an order awarding "temporary custody" of Corby Joe to the father with visitation to the mother.

We are unable to locate the "Memorandum Opinion" referred to in the trial court's 3 February 1989 order. However, the trial court, at the conclusion of the 17 and 18 January 1989 hearing, did make certain statements which may be construed as oral findings. They are in pertinent part as follows:

> In this particular case, ... the court, ... is dealing with basically two very good people. The court really can't find anything wrong with either party. [I]n this ... case the court finds that both people are fit people to have custody.
>
> ....
>
> There is no question that the mother in this case has been the primary custodian of the child through at least the early part of its life....
>
> ....
>
> The child needs a role model, it needs to know and understand what those roles are in its life. If there is a situation that exists, as it is in this particular case, where there is another party in the picture, that confuses the child.
>
> The mother has been very candid with the court, says she's involved in an adul-

**1.** Hereafter the plaintiff, Candace Sutherland, will be referred to as the mother and the defendant, Christopher Sutherland, will be referred to as the father.

tress [sic] relationship. The court—while the court cannot condone that, the court necessarily can't control the people's lives if they make that decision. Both of them are adults and many times that happens. The problem is when we involve the child in that decision that we make. And in this particular case the child has been involved in the mother's decision, and that is not proper for a parent to involve a child in a decision such as this.

And what particularly disturbs the court, as the court pointed out one of the things the court looks to is a support system, and it seems to be the family of the mother, in this particular case, has acquiesced in this conduct. And that disturbs the court.[2]

Children do not understand these type things. A four year old child cannot understand why another male figure would be in his life and not be any explanation as to where that male figure is coming from or what his role is in this child's life. There is no proof really before the court that the adultress [sic] relationship of the mother has affected the child. But as in any case, just as in a jury case the court instructs the jury you don't throw out all of the common sense that you bring into the courtroom, likewise with a judge, he does not throw out his common sense. And all of the testimony that the court has heard from experts in this area leads to the conclusion that this type of situation confuses a child, the child does not understand the role models in his life when this is occurring.

For that reason, the court—it later will explain, the court is going to appoint a guardian ad litem for the child. That guardian ad litem is to make a report to the court. One thing that does bother the court in this particular case is that the mother, having testified that she realized that this conduct was wrong, did not stop this conduct on her own, she stopped this conduct on the advice of a former counsel. And that gives a problem with the court—the court [has] some problem as to her sincerity of not wanting to affect the child. That's the reason the court believes that a guardian ad litem probably will be proper in this case to make an independent evaluation.

While the court in its "oral findings" determined that a "guardian ad litem" should be appointed, so far as we are able to determine from the record this was never done.

The court referred to "experts" who have testified in other cases in reaching, at least in part, his decision to award "temporary custody" of the child to the father.

◼ Courts may not take "judicial notice" of testimony in prior unrelated cases. Courts must decide cases on competent evidence introduced in the trial of the case. However, it may take judicial notice of certain facts which are common knowledge to all intelligent men. 29 Am.Jur.2d *Evidence* § 14 (1967). "[F]acts which are not judicially cognizable must be proved, even though known to the judge or to the court as an individual." *Id.* at § 15. Facts contained in "expert" testimony in prior cases of this type before this trial court do not constitute facts which are common knowledge to all intelligent men.

◼ Notwithstanding that "experts" have testified in other cases involving the same type issue, the trial court cannot rely on the "expert's" opinion in deciding a case in which the "expert" has not testified. There are many reasons for this rule. An expert must form an opinion based on the facts of a particular case. The expert must be available for cross-examination by the adverse party. A party cannot cross-examine an expert who did not testify in the case. It goes without saying that all children are not the same and what may be detrimental to one child may not be detrimental to another. It was error for the

---

**2.** Our review of the record shows that the mother, Corby Joe and the mother's boyfriend visited the mother's sister in California and the mother's father in Georgia. Neither the mother's sister nor father admonished her concerning her relationship. The trial court undoubtedly saw their lack of admonition as acquiescence.

trial court to rely on this type of evidence in making its determination.

From the trial court's "oral findings," it appears that temporary custody was granted to the father solely because the mother had engaged in an adulterous affair even though the trial court found that there was no proof that the affair had "affected the child."

The evidence is uncontradicted that the "affair" had come to an end before the hearing, that this was the one and only time that the mother engaged in such conduct, and that the affair had had no adverse effect on Corby Joe.

We wholeheartedly agree with the trial court that extramarital affairs are not to be condoned. However, the mother may not be punished because of an extramarital affair by awarding custody of the parties' child to the father. *Long v. Long*, 488 S.W.2d 729, 733 (Tenn.App.1972). Sexual infidelity or indiscretion does not *ipso facto* disqualify a parent from being awarded custody. However, when the parent's sexual activities or indiscretion involve neglect of the minor child, such neglect may be considered in relation to the best interest of the minor child. *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn.App. 1989). In this case there was no evidence, either at the show cause hearing or at the final hearing, that the mother had neglected Corby Joe.

This Court, in *Bah v. Bah*, 668 S.W.2d 663 (Tenn.App.1983), set forth a nonexclusive list of factors to be considered in determining where the best interest of the child lies when awarding custody. These factors include:

1) the age, habits, mental and emotional make-up of the child and those parties competing for custody;

2) the education and experience of those seeking to raise the child;

3) their character and propensities as evidenced by their past conduct;

4) the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child;

5) the availability and extent of third party support;

6) the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative;

7) and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nuture.

668 S.W.2d at 666. Taking those factors into consideration as they apply to the facts of this case which were adducible at the "show cause hearing" and the final hearing, the evidence preponderates against the trial court's conclusion that it is in the best interest of Corby Joe that the father be awarded custody.

The evidence in this record shows that the mother and Corby Joe have a very close relationship. The father admitted that the relationship between the two is "as close as any mother can have with her child." All who testified stated that the relationship between Corby Joe and his mother was very good. The paternal grandmother stated: "I would agree" that Candace Sutherland is a good mother. "She probably over mothers, if anything." The record also shows the mother to be a "very conscientious, hardworking committed worker" who is "very stable" and "very dependable."

The mother was described by those who know her as being very patient. On the other hand, the father has a high temper and frequently loses his temper in the child's presence. He also admitted to using vulgar language in the child's presence. The father admitted that Corby Joe had picked up some bad habits from him. One of these is the practice of saying "I don't give a damn." He admitted that Corby Joe was present when he was "hollering so loud" at the mother and putting his finger in her face. The father also admitted that Corby Joe has emulated him in that type of temper tantrum.

The mother is very involved with church and teaches in the Sabbath school. She takes Corby Joe with her to church when

she has him for visitation. On the other hand, the father is not very involved in church activities.

The mother testified about her specific plans for Corby Joe's educational and social environment. In contrast, the father had given little thought to Corby Joe's future, including where he and Corby Joe would live after the parties' home was sold.

Both the mother and father are employed outside the home. Therefore, no matter which parent has custody, it will be necessary for them to have help from an outside source for the care of the child.

At the show cause hearing, the father testified that in his job as a pilot with American Eagle in Nashville, his schedule changes from month to month and that, on his current schedule, he would be gone from home seventeen to eighteen nights per month. At the final hearing, the father testified that his schedule had changed since the show cause hearing and he was home more often. He testified that under his current schedule he would be gone from home no more than two nights in a row. Corby Joe's paternal grandmother lives in Lawrenceburg, Tennessee, and usually travels to Nashville three or four days a week to take care of Corby Joe when the father is working.

The mother is employed as an administrative secretary at Tennessee Christian Medical Center in Davidson County. She has been so employed for ten years. She works late some evenings but this is in order to make up for the time she takes off for visitation. If she were awarded custody, she would not be working late.

The mother testified that if she were awarded custody, she would send Corby Joe to day care and that he would be starting a two-year kindergarten program at the day care center beginning in August 1990.

We have considered the fact that the father has had physical custody of Corby Joe since the show cause hearing. We, therefore, have reviewed this record in detail in an attempt to determine if there is anything to show that changing physical custody to the mother after an approximate two year period would have a detrimental effect on Corby Joe. As we have stated, the record discloses that Corby Joe and his mother have a very close and loving relationship. From the evidence before us,[3] we are of the opinion that a change of custody from the father to the mother would have no detrimental effect.

Our review of this record has been pursuant to Tennessee Rule of Appellate Procedure 13(d). That review shows that the evidence preponderates against the judgment of the trial court and preponderates in favor of awarding custody to the mother. On remand, the trial court shall enter an order awarding the mother the care, custody and control of Corby Joe. The trial court shall also conduct a hearing to determine the amount of child support the father is to pay to the mother for the support of Corby Joe.

The judgment of the trial court in awarding custody of Corby Joe to the father is reversed. The judgment requiring the mother to pay child support to the father for the support of Corby Joe is reversed, and the cause remanded for further proceedings consistent with this opinion and for the collection of costs which are taxed to the father.

CANTRELL and KOCH, JJ., concur.

---

3. Neither of the parties offered any evidence to show what effect a change of custody would have on Corby Joe.