IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2005 Session

## SHAVA LYNN KENDRICK v. LARRY BERT KENDRICK

**Appeal from the Chancery Court for Houston County**
**No. 6-90      Leonard W. Martin, Judge**

**No. M2004-00540-COA-R3-CV - Filed July 8, 2005**

This case involves a father's efforts to protect his children from their mother's sexually abusive relatives. When the mother filed for divorce in the Chancery Court for Houston County, she also filed a notice of intent to relocate with the children to the State of New York to be closer to her family, including a stepfather who had sexually abused and raped her when she was a child. Following a bench trial, the trial court declared the parties divorced, designated the mother as the primary residential parent, and permitted the mother to move to the State of New York with the parties' children. The father has appealed, arguing first that the trial court's custody and relocation decisions have exposed the children to an unreasonable risk of sexual abuse and second, that the trial court erred by refusing to designate which of the parties should be permitted to claim the children as tax exemptions. We have determined that the trial court erred by allowing the mother and the children to move to the State of New York without sufficient proof regarding their safety. We have also concluded that the court erred by refusing to address the parties' tax exemption issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee, for the appellant, Larry Bert Kendrick.

Markley Runyon Gill, Erin, Tennessee, for the appellee, Shava Lynn Kendrick.

**OPINION**

**I.**

Larry Bert Kendrick and Shava Lynn Kendrick met while serving in the military and married in 1997 in Montgomery County, Tennessee. They had three children together: Daniel, who was born on June 26, 1997, and twins Amanda and Adam, who were born on February 6, 2001. After several years of marriage, the parties experienced some marital discord stemming from Mr. Kendrick's lack of involvement with the children. Mr. Kendrick, who was then working as a long-haul truck driver, was routinely away from home five days per week. His prolonged absences required Ms. Kendrick, who was disabled, to stay at home to care for the children. On the days when

Mr. Kendrick was home, he often refused to help Ms. Kendrick with the children either because he was too tired or because be had other errands to run. He also declined to care for the children when Ms. Kendrick wanted to run errands or visit with her friends. Accordingly, Ms. Kendrick was required to hire a babysitter, even when Mr. Kendrick was home.

On February 25, 2003, Ms. Kendrick filed a complaint for divorce in the Chancery Court for Houston County, citing inappropriate marital conduct and irreconcilable differences. She submitted a temporary parenting plan designating herself as the primary residential parent. On March 6, 2003, Mr. Kendrick filed an answer and counterclaim asserting that it was Ms. Kendrick who was guilty of inappropriate marital conduct. He also submitted a temporary parenting plan designating Ms. Kendrick as the primary residential parent, even though he had stated in his answer that he was capable of being the primary residential parent.

On April 8, 2003, the trial court established a temporary parenting plan designating Ms. Kendrick the primary residential parent and allowing Mr. Kendrick liberal visitation. On April 9, 2003, Mr. Kendrick filed a motion to reduce his child support obligations on the basis that his job status changed. He had decided to stop doing "over-the-road trucking" and to instead drive a local route in order to have more free time and a more normal schedule. The trial court granted his motion and reduced his child support from $400 to $300 per week.

Both parties moved away from Houston County after they separated. Mr. Kendrick moved to Columbia, Tennessee, and Ms. Kendrick moved to Clarksville, Tennessee. However, on May 28, 2003, Ms. Kendrick filed a motion seeking permission to relocate to either Illinois, New York, or Missouri to be closer to her family. Mr. Kendrick opposed the motion to relocate. On June 19, 2003, the trial court conducted a bench trial regarding all pending issues. During this hearing, Ms. Kendrick asserted that she desired to be the children's primary residential parent and stated that she intended to move to the Canton, New York area. She also testified that she would possibly be living with her mother and stepfather while she attempted to establish herself.

For his part, Mr. Kendrick argued that he was more fit to be the primary residential parent. He also asserted that permitting Ms. Kendrick to move to the State of New York to live with her mother would subject the children to the risk of sexual abuse because of their proximity to Ms. Kendrick's stepfather, who had sexually abused and raped Ms. Kendrick when she was a child. He also pointed out to the court that allowing Ms. Kendrick to move to Missouri to live near her biological father would entail similar risk because Ms. Kendrick's biological father had also sexually molested her when she was a child. He also informed the court that Ms. Kendrick was mentally unstable, that she was battling depression, and that she had twice attempted to commit suicide.

Ms. Kendrick responded by assuring the trial court that she would protect the children from her father and stepfather if she did relocate, that she had no issues with depression, and that Mr. Kendrick himself battled depression and had urged her to commit suicide. She also insisted that the children would essentially be raised by a nanny if Mr. Kendrick were designated as the primary residential parent because of Mr. Kendrick's work demands.

Ruling from the bench at the close of the hearing, the trial court declared the parties divorced, designated Ms. Kendrick as the primary residential parent, and allowed her to relocate. Mr. Kendrick was given three weeks of visitation per year, in addition to any other visitation agreed to by the parties. The final decree, however, did not include a parenting plan. Ms. Kendrick and the children promptly moved to the State of New York and are currently residing in Canton, New York near the Canadian border.

On August 26, 2003, Mr. Kendrick filed a motion for new trial and to alter or amend the judgment. He stated that the lack of a parenting plan was causing problems between the parties, and specifically requested the court to address which parent would be allowed to claim the children as exemptions for income tax purposes. He also stated that he had proven at trial that he should be the primary residential parent, especially because Ms. Kendrick moved the children to New York after the divorce hearing, giving her potentially abusive stepfather access to them.

The trial court conducted a hearing and denied the motion for a new trial. The court also refused to designate which of the parties would be permitted to claim the children on their tax returns. The court opined that the federal tax laws were too "complicated and convoluted" for the court to adequately address and told the parties that it was basically "between you and the tax service, and you have to abide by their rules, unless y'all agree on something between you that suits you better." The court then ordered the parties to submit permanent parenting plans. While Ms. Kendrick complied with the order, Mr. Kendrick failed to submit a permanent parenting plan, and the trial court therefore basically adopted Ms. Kendrick's permanent parenting plan with some alterations.

## II.
### DESIGNATING MS. KENDRICK AS THE PRIMARY RESIDENTIAL PARENT AND PERMITTING HER TO MOVE TO THE STATE OF NEW YORK

The principal issues on appeal relate to the trial court's approval of Ms. Kendrick's permanent parenting plan designating her as the children's primary residential parent and permitting her to move to the State of New York. Mr. Kendrick states that the evidence does not support the trial court's decisions and that the trial court did not properly consider the factors in Tenn. Code Ann. § 36-6-106(a) (2001) and Tenn. Code Ann. § 36-6-404 (Supp. 2004). We have determined that the record does not provide an adequate basis for concluding that allowing the children to be in their mother's custody in New York is in the children's best interests.

### A.

Custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). Courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993). The needs of the children are paramount, while the desires of the parents are secondary. *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). Custody should never be used to punish or

reward the parents, *Turner v. Turner*, 919 S .W.2d 340, 346 (Tenn. Ct. App.1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App.1972), but rather should promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).

There are no hard and fast rules for determining which custody and visitation arrangement will best serve a child's needs. *Taylor v. Taylor*, 849 S.W.2d at 327; *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App.1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn.1988). The Tennessee General Assembly and the courts have identified the factors that trial courts should consider. Tenn. Code Ann. § 36-6-106(a) (2001); *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App.1983).

Courts customarily devise initial custody and visitation arrangements by engaging in a comparative fitness analysis that requires them to determine which of the available custodians is comparatively more fit than the other. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App.1995); *Bah v. Bah*, 668 S.W.2d at 666. This "comparative fitness" analysis does not measure the parents against the standard of perfection because the courts are pragmatic enough to understand that perfection in marriage and parenting is as evanescent as it is in life's other pursuits. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App.1998). Rather, the analysis requires the courts to determine which of the parents, in light of their present circumstances, is comparatively more fit to assume and discharge the responsibilities of being a custodial parent.

Custody and visitation decisions often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App.1997). Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters,[1] but they still must base their decisions on the proof and upon the appropriate application of the relevant principles of law. *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App.1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

Trial courts necessarily have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998). It is not our role to "tweak [these decisions] . . . in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding custody or visitation should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d at 88.

---

[1]Tenn. Code Ann. § 36-6-101(a)(2) (2001) vests the courts with "the widest discretion to order a custody arrangement that is in the best interest of the child."

**B.**

Ms. Kendrick has admitted that her stepfather sexually abused and raped her for several years during her childhood. Yet, she decided that she and the parties' children would move in with her mother and stepfather while she was getting herself established. Other than vague promises to protect the children from her stepfather, Ms. Kendrick provided no concrete information about the steps she would take to prevent her stepfather from abusing them. When making both custody and relocation decisions, the courts must consider, among other factors, the character and behavior of other persons residing in or frequenting the parent's home and these persons' interaction with the child. Tenn. Code Ann. §§ 36-6-106(a)(9), -108(c)(11), -404(b)(13).

Many red flags should have been raised by Ms. Kendrick's suggestion that she move the children to either Missouri to be nearer to her biological father or to New York to be nearer to her mother and abusive stepfather. Additional alarms should have been sounded when Ms. Kendrick stated that she might actually live with her mother and stepfather in New York. This admission alone should have prevented the trial court from allowing Ms. Kendrick to relocate without first determining whether the relocation was in the children's best interests. Tenn. Code Ann. §§ 36-6-108(d)(3), -108(e). The trial court, however, appeared to pay little heed to the fact that Ms. Kendrick's biological father and her stepfather are pedophiles. The court should never have allowed Ms. Kendrick to relocate to New York without conducting a best interests analysis and requiring her to submit specific plans regarding how she planned to protect her children from sexual abuse.

Devising a permanent parenting arrangement in this case is further complicated in two ways. First, the children have been living in the State of New York since 2003. Second, the record contains no evidence regarding the extent to which Ms. Kendrick's stepfather has had access to the three children. Before any court uproots these children, it must first be absolutely clear that such a move is necessary.[2]

For these reasons, we remand this case for a hearing regarding the status of the children, their interaction with Ms. Kendrick's stepfather, and the ways in which Ms. Kendrick is protecting the children's health and safety. To aid the trial court in this inquiry, Tenn. Code Ann. § 36-6-215(a)(3) (2001) authorizes Tennessee's courts to request another state to conduct a custody evaluation and to have the results of the evaluation forwarded to the court. Thus, in addition to the evidence submitted by the parties themselves, the trial court may further inform its decision regarding the parties' children using the evidence obtained by New York's child protective services agency.

If sufficient proof is presented that Ms. Kendrick is unable to ensure her children's safety in their current environment, the trial court shall take all necessary steps to remove the children from that environment, which may include designating Mr. Kendrick as the primary residential parent if appropriate. Further, if it is found that the children are in danger, the court shall order Ms. Kendrick

---

[2]Children thrive in stable environments. *Aaby v. Strange*, 924 S.W.2d at 627; *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); NATIONAL INTERDISCIPLINARY COLLOQUIUM ON CHILD CUSTODY, LEGAL AND MENTAL HEALTH PERSPECTIVES ON CHILD CUSTODY LAW: A DESKBOOK FOR JUDGES § 5:1, at 51 (1998).

to appear before it with the three children as well as issue "any orders necessary to ensure the safety of the child[ren] . . . ." Tenn. Code Ann. § 36-6-225(a), (c).

## C.

Ms. Kendrick argues that Mr. Kendrick waived any right to challenge her permanent parenting plan because he failed to submit a permanent parenting plan of his own. While we agree that parties must follow trial court orders, we decline to find that Mr. Kendrick's failure to file a parenting plan of his own signals his acquiescence in Ms. Kendrick's parenting plan. The undisputed evidence regarding the history of abusive conduct on the part of Ms. Kendrick's stepfather and biological father should have been sufficient to prompt the trial court to stay its hand until additional evidence regarding the steps that would be taken to protect the children had been presented. Therefore, we conclude that the court erred by adopting Ms. Kendrick's parenting plan and designating her as the primary residential parent without requiring her to demonstrate that her move to New York had not and would not expose the parties' children to a risk of sexual abuse.

## III.
### THE DEPENDENCY EXEMPTION

Mr. Kendrick also argues that the trial court erred by refusing to designate which of the parties would be allowed to claim the children as exemptions for tax purposes. He states that this refusal is causing unnecessary confusion between the parties. Ms. Kendrick argues that the trial court properly refused to address the parties' tax issue because Mr. Kendrick raised this issue for the first time during the hearing on the motion for a new trial. She also argues that it is within the trial court's discretion to decide whether to allocate a dependency exemption. We disagree with Ms. Kendrick's arguments.

Tenn. Code Ann. § 36-5-101(d)(1)(E)(xii) requires trial courts to consider the tax consequences to each party when fashioning child support payments. As we recently stated, "[t]he courts should consider the tax consequences of their child support orders. Their decisions with regard to the allocation of exemptions for minor children are discretionary and should rest on facts of the particular case." *Barabas v. Rogers*, 868 S.W.2d 283, 289 (Tenn. Ct. App.1993) (citations omitted); *see Engel v. Young*, No. M2001-00734-COA-R3-CV, 2003 WL 1129451, at *6-7 (Tenn. Ct. App. March 14, 2003) (No Tenn. R. App. P. 11 application filed) (clearly setting forth the standards to use when determining which party shall be allocated a dependency exemption).

The duty of a trial court to make these considerations is clear from the statute and need not be raised by the parties to take effect. Therefore, the tax exemption issue was not waived by Mr. Kendrick when it was raised for the first time during the motion for new trial hearing. The trial court erred by refusing to address the tax exemption question. On remand, the court is directed to determine which of the two parties will be permitted to claim the children as exemptions for income tax purposes.

## IV.

We vacate the judgment and the permanent parenting plan designating Ms. Kendrick as the primary residential parent and remand the case for a timely hearing consistent with this opinion.  We tax the costs of this appeal in equal proportions to Larry Bert Kendrick and his surety and to Shava Lynn Kendrick for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.